Did you call this case for argument? Yes. All right. Mr. Duncan. Yes. Good morning, Your Honor. Good morning. Counsel, may it please the Court, Robert Duncan on behalf of the Plaintiff's Appellants in this case. Plaintiff's Appellants claims in this case are not properly dismissed at the 12B6 stage. They're not properly dismissed for three specific reasons. First and foremost, the filed rate doctrine should not be applied to the insurance industry in the State of Missouri, certainly not the long-term care insurance industry in the State of Missouri, and most certainly not at this stage of the litigation. The filed rate doctrine has never been applied in the State of Missouri until this case, until the lower court decided that it was an affirmative defense in cases against insurance companies like this one. The reason it shouldn't be applied is because, based on the evidence in the record at this early stage, there is no evidence to support that the filed rate doctrine should be applied to the insurance industry or the long-term care insurance industry. It's not an evidentiary issue. It's not an evidentiary issue, but from a legal standpoint, as a question of law, there is no basis on which to conclude that the filed rate doctrine would apply based on what we know at this stage. What was considered by the lower court is insufficient to find or support its conclusion. So how do all the other states, so all the other states are wrong? I'm not saying all the other states are wrong. What I'm saying is that the lower court in this situation is wrong based on the analysis that it performed. The analysis that it performed disregarded information that is within the record that supports that the Missouri State Supreme Court would find the exact opposite of what the district court suggested. In other words, the Missouri State Supreme Court would say, the filed rate doctrine does not apply to the insurance industry. And the primary reason why it doesn't apply is because it lacks the common denominator where the filed rate doctrine has been appropriately applied. And that's where a regulatory agency has approved the filed rate. In this case, the rate has not been approved. The Missouri Department of Insurance does not approve long-term care insurance rates. It also doesn't approve commercial casualty rates. It says as much in the statutes that... All right, give me a case that defines approved the way you want it. Because I think your focus on approved versus not rejected is not persuasive to me. Your Honor, I can't point to a case that focuses or defines the word approved. Plain language says that the word approved doesn't have to be there. It wasn't in Keogh. It's just not. Yes, it has to be thoroughly regulated. And the rate has to be, well, subject to approval. Here it's subject to approval. It can be rejected. No, but here's the issue, Judge. I'm not the one that's drawing the distinction between accepted and approved. It's the Missouri Department of Insurance that's drawing that distinction. The Missouri Department of Insurance, in correspondence to MetLife, says... So it's not as though I'm splitting hairs here. It's the Department of Insurance that has disavowed itself of the ability to approve a rate that's been submitted to its regulatory body. Does the Missouri Department of Insurance, does it actually reject rates occasionally that are submitted? Because I would assume that if you quadruple the rate in a single year that they're going to reject that. So do they reject using that term as it's been used in other contexts? They return those rates to the insurance company. They say, we need X, Y, and Z. But they haven't rejected a rate based on the hypothetical that you just gave where it's a quadrupling of the rate. I was just curious. I'm giving that sort of as an extreme example. Do you know any cases where they've rejected a rate, whether it be double, triple, 10%, 5%? Or is it merely we need more information. Once they get the information, they rubber stamp it? I'm not aware of any situation where the Missouri Department of Insurance has rejected a rate. They have requested or scheduled the rate to be implemented over a number of years as opposed to one year. But I'm not aware of a situation where they have rejected a rate increase. All that being said, I think it's based on the totality of the information, the application of the filed rate doctrine to the long-term care insurance industry in the state of Missouri disregards what Missouri courts have accepted in other industries and required of other industries. And that's to demonstrate that the rate itself has been approved. And you need to look no further than that. They look at the specific rider that's being adopted by an insurer. And until that's accepted, it can't be used, right? Your Honor, what they do is they accept the information that's provided by the insurance company based on the scheme that exists, the regulatory scheme that exists. There is no evidence that they approve the rate that is going to be charged. That being said, even if this Court is inclined to extend the application of the filed rate doctrine to the long-term care insurance industry, it does not properly bar plaintiff's claims in this case. Plaintiff's claims in this case have been grossly mischaracterized by MetLife. The reason they've been grossly mischaracterized by MetLife is because they need to do that in order for the filed rate doctrine to be a defense to the plaintiff's claims. Plaintiff's claims do not quarrel with the rate or the rate charged or the premium increase that was implemented. Plaintiff's claims are very simply that they were defrauded based on affirmative misrepresentations and information withheld into paying an accepted rate. But that was the information that was submitted to the regulators, correct? So the information that you're alleging was false is the same information that was submitted to the regulators, correct? No, Your Honor. The information that we're alleging is false is the information that was provided to these insurers in the policy describing the product that they purchased, namely the 5% compound interest rider. Right, but to get that, didn't they have to submit to the regulators that this is we anticipate that this rate will, forgive me for not remembering the exact language, but they had to present to the regulators how they came up with that number and why they believed the statement that they presented to the insurer. Am I not right? They had to provide actuarial justification for the rate that they intended to charge to the Missouri Department of Insurance. That is correct. What we're quarreling with and what we believe we've been aggrieved by is the language that was used to induce the purchase of this rider. It sets aside whatever was Which was the language submitted to the regulators. The language you're relying on could be inferred and your argument could be inferred by the regulator from the information they received. But the filed rate doctrine applies only to the rate. It doesn't apply to the misrepresentations that were made to the insurers as alleged in this case. That's your argument. The filed rate doctrine doesn't apply to fraud. I didn't find, I don't, there's case law against that. Yeah, what about the fraud? I mean, it seems like there's a couple steps here than the fraud exception. What's your view on that? Because there are several courts have said there's just no, at least talking about the filed rate doctrine as a thing, not necessarily applied here, but that there is no fraud exception. So the fraud exception, again, it focuses, in the context of the filed rate, it focuses on the filed rate. It doesn't give a regulated entity carte blanche to make whatever representations it might want to make to the consumers that are out there buying its product. Can I follow? What representation was made that wasn't in the filings? The specific representation that was made is that as a result, so, quote, your premium is not expected to increase as a result of the benefit amount increases provided by this rider. They disavowed or disclaimed a relationship between the amount being paid. There's no disavow there. Sure. It doesn't address the question. I think that conclusion is very premature, and it's subject to discovery in this case, because what the evidence will show, and I know it will show, is that there is a relationship between these folks purchasing this rider, paying double at the outset for a 5% increase in the daily benefit amount, and future premium rate increases. You'll probably, your expert witness will probably be an insurance regulator. We'll likely have a myriad of experts that are going to comment on this case. And the insurance regulator said, yeah, well, and on cross-exam, you could have told that, you would have known that from the filing with your knowledge of how this business works, and he'd say, right. But again, we're not quarreling with what they did in terms of how they calculated the premium, the premium that they charged, or even the rate increase or premium increase that they've implemented. What we're quarreling with is the representations that were made. No, you're really saying it was the failure to advise something that you knew was going to happen, and the plaintiffs weren't smart enough to know that because they aren't in the business. Well, I think that touches on some of what we're saying. There's no doubt that MetLife was in a far superior position in terms of what they knew or didn't know in terms of what the future held. That's what their job is, is an insurance company. But we were induced, fraudulently, to pay an accepted rate. And that needs to be allowed to stand, certainly at the 12B6 stage. Furthermore, the administrative requirement or administrative review did not need to be exhausted under the facts as alleged in this case based on the claims that plaintiffs are making related to those statements that they were defrauded by. Why not? If it has to do with, I think that this is looser than perhaps the filed rate doctrine, and that it seems to be covered by the plain language of the delegation for exhaustion, or the administrative agency review. Because as I've articulated, plaintiffs' claims are not the rate, the rate schedule, the rate premium, or the underwriting rules. It has to do with the representations that were made and the information that was withheld, which is separate and distinct from what is required or what circumstances require administrative review. You don't think it's related to the underwriting rules? I mean, your whole theory is based on how they underwrote this policy and the actuarial tables they used to set the premium and project the future. Yeah, and that's the mischaracterization that MetLife has led the district court into believing or understanding, and now this court potentially, is that that's what this case is about. And it's not. We don't quarrel with that. It has nothing to do with the underwriting rules. As we allege in paragraph 72 of our complaint, if MetLife had stayed silent on this issue, had not said, as a result of the benefit amount increases provided by this rider, and simply conveyed the information that was required by statute to the insureds, we wouldn't be here. There would be no claim. But they took a step too far. They understood and knew going into this transaction that they were protected, or arguably protected, by the filed rate doctrine. And then they went further. But because they wanted to bring all these people in, the disclosure, here's the problem that I'm having, though. The disclosure also says that we reserve the right to increase the premiums on a class-wide basis. And so, you know, then again, I think that gets at the potential underwriting rules, which is they're acknowledging that if a class of people, if the circumstances change, you may, in fact, have premium increases. And again, just think that that might be an underwriting rules type situation. So we reserve the right to increase premiums on a class-wide basis is not what we're acting on. That's not what we're bringing our claims on. That was apparent in the policy. That's the right that they had. And we don't quarrel with their right to do that, or how they did it, or the information that they supplied to do it. And isn't that what happened? I mean, they increased on a class-wide basis, right? They absolutely did, yes. And that's not a problem for you, you don't think? It is not. Okay. Tell me why. It's not a problem because that's not what we're acting on here. We've pled, as required under Rule 9, this dynamic scheme that existed that MetLife employed to get as many people into this product as they possibly could, knowing that they're going to collect double premiums over decades before anybody is likely going to make a claim, right? We're looking at that narrow area where the transaction occurred and where the policy was provided and why people bought this rider. Well, let me ask you this. Not how they priced it, the price of it, or the future price of it, but why did they make the decision to purchase the rider? Well, let me ask you this. Could your clients have sort of filed an administrative grievance, an administrative complaint, saying, hey, they promised me that they wouldn't raise the rates and here's the policy and you should do something about that and not let them raise the rates on a class-wide basis? Or would that have just been rejected as outside the scope of an administrative process? I would say that I can't speculate as to what the department would have done under those circumstances. However, what I can say is in response to the question, based on the theory that we're pursuing here, it wouldn't be that they raised the rates. It would be that we were told that there was a disconnect or they disclaimed the relationship between the benefit amount that was provided by this rider and future premium increases. I'll save the balance of my time for rebuttal, which will be fast. Thank you. Ms. Hauser? Good morning, Your Honors. Sandra Hauser from Denton's on behalf of Metropolitan Life Insurance Company. Your Honors, plaintiff's allegations in this case go directly to the heart of what the insurance regulators in Missouri and Illinois regulate, which is the adequacy of premium rates and the compliance of those rates with the comprehensive statutory and regulatory regime that governs them in both states. This is readily apparent when you compare the allegations of plaintiff's complaint here with the precise inquiry that Missouri and Illinois undertake. The district court did a very detailed analysis of this. Plaintiff's core allegation here is that MetLife knowingly underpriced its long-term care insurance to justify future rate increases. They point to language saying that rates are not expected to increase as a result of the benefits provided by the rider. When you look at what Missouri and Illinois require, Missouri and Illinois first of all require MetLife to offer the inflation rider and require that MetLife include an offer of premium which the insurer expects to remain constant. That is in the Missouri regulations at section 400-4.111F and in the Illinois Administrative Code Title 50-2012.80F. They're required to include that language. They can't stay silent. But how do you deal with opposing counsel's argument that they don't really approve anything? They've never rejected anything to his knowledge. They've spread out the increase in premiums, but it seems like that's one thing that potentially stops the file rate doctrine from strictly applying. Here again, Your Honor, it's an excellent question and it's one that the district court tackled at great length at pages in the addendum 12-14 of that opinion. There are three reasons why it's very clear that both states here actually are approving rates. First of all, when you look at the statutory scheme at issue, both states clearly have the power to not only enforce rates, but enforce compliance with the regulation I just mentioned, with the statutory section that focuses first primarily and not exclusively, but primarily on premium rate adequacy. There's the power to investigate. There's the power to order cease and desist from offering a rate that's inadequate. It is a very robust statutory scheme that authorizes the Missouri director to remedy any violation or anything that looks like a substantial step toward a violation, both at the most general level and at the specific level of long-term care rates. The first thing I would point to is that statutory scheme. Your Honor, Judge Loken, you actually rehearsed that scheme in your 2008 opinion in the Saunders case, which is not a file rate decision. It was your decision on the McCarran-Ferguson Act, but it's a very detailed recitation of the statutory authority generally of the Missouri Department. And do they actually carry out that authority? Is that your understanding? They do. They do because my point number two here is if you look at the record in this case, if you look at the record of the actual filings here by MetLife, I mean there's 500 pages of record. But look specifically at one page of the record, which is Appendix 2634. In 2016, when MetLife put in its request for a rate increase, Missouri rejected that. I mean before you even get to the fact of rejection, there is extensive correspondence between each of the states here, Missouri and Illinois, and MetLife about their filings. Illinois goes so far as to hire an independent actuarial firm to analyze the rate filings. There are questions. There are letters back and forth. And Missouri, at that page of the record I cited, said to MetLife, we don't agree with this rate increase. We think the rate increase isn't supported. And there's, forgive me if I'm not able to read this small type here from the podium, but Missouri said the projected losses on this block of business might imply the need for a substantial rate increase. However, it's not clear. And they go on to explain what will happen, in their view, in terms of what they call shock lapses if this rate is approved. Now is that a rejection? I don't know. If you're my client, MetLife, are you going to say, oh Missouri, you don't have the power to tell me what to do. I'm going to go ahead and do this. That's kind of what plaintiffs are saying. I'm just trying to figure out the limits of the argument. Suppose we have the exact same facts, except for MetLife says, we promise we will never raise rates in your lifetime. Period. Full stop. And two years later, MetLife decides, oh my goodness, we're going to take a huge loss on this. We're going to increase it by $100. Now under that hypothetical, does the filed rate doctrine apply? Well, I think you would have a different claim here, and you probably would have a breach of contract claim. But I do think there would be, and that's not this case, there would be a very strong argument still that the filed rate doctrine applies because MetLife can't raise its rates without going to Missouri and Illinois and actually each department in the country for that rate increase and justifying it. In that hypothetical, the regulator might say, well, you can do that, but you have to file a new rate. You're talking about, you know, you said you wouldn't do this, and you say now we have to, and okay, file a new rate. Right. I mean, look. Isn't that a likely part of insurance regulation? That's right. And, look, it is beyond clear here that the regulators take this very seriously. The long-term care regulation is some 50 pages long. Now is there, to your question about the limits of the doctrine, we're not standing here saying there is nothing that a plaintiff could say about a long-term care insurance policy that wouldn't run into the filed rate doctrine. There are things that could be said about the coverage, you know, there are all kinds of cases that could be brought, but not one like this case here. I just wonder whether that should give us pause, that hypothetical should give us pause, because even if it goes to the regulator, I mean, what drives a lot of insurance is the rate. If MetLife is making this promise and their rate is, say, half what the rate of a competitor is, and then they immediately turn around, I mean, insurance is going to feel pretty aggrieved that they paid two or three years worth of rates, and now they can't afford the insurance policy anymore. They might feel aggrieved, but both the policyholder in that situation would have a clear right to go to the Missouri Department and complain. That's fair. That gets to exhaustion. MetLife could not, or any insurance company, because, I mean, part of the public record factual background here is that MetLife is not the only long-term care insurance company that has raised its rates. It's pretty clear across the industry that nobody knew how to price these products, and every company has sought rate increases based on their experience. But sort of leaving that aside, MetLife could not have just gone ahead and increased its rates. It would have to either file a new form, file a new rate, and get authority and approval for that rate increase, supported by an extensive actuarial memoranda. And that actuarial memoranda can't just say, oh, well, looks like we're not making money. We need this. You have to actually justify the rate increase based on criteria that's also set forth in the regulatory scheme in both of these states and in other states as well. You have to show how your actual experience is different than what you expected at pricing, right? And remember here that the regulation requires an offer, a premium which the insurer expects to remain constant. One last point on this. On the exhaustion of remedies, which you kind of briefly hinted at, if they would have exhausted their remedies, if the plaintiffs exhausted their remedies and said, hey, this is completely unfair, it's a misrepresentation, it's fraud, et cetera, could the director of insurance then go back and say, okay, and I'm not saying they would do this, but could they go back and say, well, you actually need to refund those premiums to everybody or to everyone because we actually find that there's merit to the objection. And again, I'm making an assumption here that there's merit. But if they would have exhausted their remedies, could they have received relief? Is that a possible thing? And what would that look like? Well, I'm not sure I can answer the question of exactly what that would look like. However, it's very clear that Missouri has the power to do that. And the power to do that comes in a couple different ways. The Missouri director has, as I mentioned before, can issue an order of cease and desist, can order an insurer to take any action necessary or appropriate to comply with the laws of the state under the statute. Does that include the power to order a refund, a premium refund? Yes, I believe it does. Well, is there a case to support it? I don't know that there is. That's not prospective. I don't know that there is a case where the Missouri Department has ordered that. We weren't able to find one. Whether that would be reported case law or not, I'm not sure. Well, how about a, can you go to court in Missouri? Can a district court order a premium refund? Sure. Well, actually, the law in this state is that if what a plaintiff is seeking is a refund of a rate that's been filed with the department, then it runs right into the Filed Rate Doctrine. That's kind of one of the core elements of the Filed Rate Doctrine. Well, that presumes the first issue, which there's no Missouri case adopting the Filed Rate Doctrine in Missouri other than the district court decision, which is the issue before us. There is no directly on-point Missouri decision. However, to Mr. Duncan's point, saying that he believes the Missouri Supreme Court would reject that application, I think the opposite is true. Here you have a situation where there is, and I won't repeat myself again, there's quite a robust statutory scheme here and regulatory scheme. It's a highly regulated area. This court, although I understand that you might interpret Missouri law as not a Missouri court per se. I thought Missouri courts had applied the Filed Rate Doctrine, just not in insurance yet. Oh, yes. There's plenty of decisions applying the Filed Rate Doctrine. If every other industry, why not this one? Right. And look, this court in a case called H.J. in 1992 has an extensive discussion of the Filed Rate Doctrine and Missouri's acceptance of the Filed Rate Doctrine. There are plenty of district court decisions as well that apply the Filed Rate Doctrine. Putting our eerie hat on, the question is not would the Supreme Court of Missouri pluck the Filed Rate Doctrine out of the blue from federal law. It's would they extend what's already been done to this industry and this particular kind of insurance. That's right. And I think the record here and I think the statutory structure here roundly supports that as the district court reasoned, as the district court held here. Is that the main support for applying it is the regulatory scheme? Well, it's the regulatory scheme. And Judge Kelly, it's the fact that the allegations here go directly to the heart of what the regulator is regulating. It's not just the idea that there's a lot of insurance law out there. It's that these allegations go right at the heart of what the Missouri regulator is looking at when it approves rates. It is looking under statutory directive and under its own regulations at premium rate adequacy and requiring the very representations that are challenged. So I think it's those things in combination. And it's also that there are a couple other factors here. Plaintiffs can't prove this case without going directly at retracing, rethinking, and redoing the exact analysis that the Missouri regulator has done here. Basically, it's a fraud on both the regulator and the consumer? Their theory is that it's a fraud on the regulator and on the consumer because it's really the same thing. They're sort of saying, you didn't tell plaintiffs what you told the regulator. But they told the regulator in great depth what every actuarial step that's supporting the rates that were proposed in order to justify and satisfy the requirement that the rates that MetLife was putting forth, as they say in the policy, are adequate and expected to remain constant, which Missouri found true at the time. There's ample law, and I'm running short on time, but there's ample law in our briefs that fraud on a regulator is not a defense to the foul rate doctrine. And you're confident that Missouri would take that next step as well? Because we've sort of got multiple steps, right? That they would extend it to the insurance industry and then to long-term care, and then if you'd have to get there, that there would be no fraud exception? Yeah. I mean, I think the easiest part is that there's no fraud exception because there's just such a bevy of law on that point. But I don't think it's a leap. And I think if this court only looks at its own precedence on the foul rate doctrine, you will see that there's not all of the different criteria for applying the foul rate doctrine applies equally in Missouri and federal law and courts across the country. It applies equally to the insurance industry as it does in an area like telephone rates or utility rates where the doctrine has been more heavily litigated. Let me come back to this remedy point. I thought the essence of the federal foul rate doctrine is no retroactive rate making. In other words, the foul rate doctrine precludes a federal court, if it applies, from ordering a premium refund. That's right. And yet that's their case. That's exactly right. And no matter how you spend their damages, it's asking for a refund. There should not be a Missouri court case ordering a refund of payments made to the provider of service or product to which the foul rate doctrine applies, like the railroad. So that suggests that if the Department of Insurance thinks the foul rate doctrine applies, it would have the power to order a premium refund. Clearly it would. But they've never taken what would be called a position on that that we could look at? I can't say absolutely that they've never taken a position on it, but I can tell you that we looked for an instance where Missouri took that kind of action and didn't find any. But I think if you look at what happens between Missouri and insurance companies on the fouled rates, there's extensive dialogue. It's an iterative process. So for that kind of action to be taken, the regulator would have had to say, insurance company, you can't do that. And the insurance company said, well, let's see what power you have to make me or something. The situation where that would come up would have to be pretty extreme. But the most I can tell you is I was not able to find. You've answered the question. Thank you, Your Honors. I appreciate your time. For rebuttal? I'll give you a minute for rebuttal. Thank you, Your Honor. I want to make three quick points. Number one, the filed rate doctrine as applied in the state of Missouri has always been contingent upon a regulatory agency approving the rate. In this case, what we have is communication from the department itself admonishing MetLife from representing that the rate has been approved. For that reason alone, this court should not apply the filed rate doctrine to insurance or long-term care insurance. Number two, no better statement highlights the plaintiff's claims than the fact that in the absence of the conduct at issue, the rate would still be the same. In other words, there is no relationship between the claims that we're making and the premium and the rate that was charged. And third, you asked, Your Honor, whether it was a fraud on the consumer or a fraud on the regulatory agency. One's actionable and one isn't. The fraud on the consumer outside of the rate is actionable under any circumstances, even if this court were to apply the filed rate doctrine to the insurance industry and long-term care insurance. Your best case, let's take a federal case with filed rate doctrine applied and your assertion was supported. I'm sorry, Your Honor. I didn't hear the question. I'm sorry. Well, you just said the fraud on the consumer always survives the application of the filed rate doctrine. No, I said the fraud on the consumer outside of attacking the rate or the premium survives. In other words, the filed rate doctrine does not. Is there a federal TO case that supports that distinction you just made? There's numerous cases cited in our brief that outline and articulate exactly how different states have applied the filed rate doctrine in a state context. I don't have at my fingertips a federal case that would support that position. However, anything outside of the rate or the rate-making process remains actionable, regardless of whether or not the filed rate doctrine applies. At the very least, plaintiff's claims have been dismissed at the 12B6 stage prematurely. We ask that the district court be reversed and the case be sent back. Thank you. Thank you, counsel. The case has been thoroughly briefed and argued, and we will take it under advisement.